**SHANLEY et al. v. UNITED STATES.**

(District Court, E. D. New York. June 27, 1921.)

1. **Seamen ⊂⇒7—Must serve until termination of voyage though beyond contract term.**

Extension of the voyage beyond the time mentioned in the contract, due to perils of the sea, which the master or owner could not reasonably be expected to guard against, is not a breach of the contract as to time, and does not warrant seamen in leaving the vessel or demanding wages in full before reaching the port of destination, but, if the voyage cannot be completed, or is ended by mutual agreement, the former articles are of no effect upon the future status of the crew, who are free to make a new agreement with the captain if he has the authority to make it.

**2. Seamen ⊙⇒7—Contract made by master on compulsion by crew held invalid.**

Libelants signed for a voyage to African ports and return to a port of the United States, the term to expire in six months. At the end of the six months the vessel, owing to delays caused by breaking down of machinery, was at a West African port where there was no consul, and another crew could not be obtained. The master proposed to extend the articles, but libelants refused, demanding a new contract at higher wages, which the master signed under protest, claiming duress. Gibraltar was the nearest port where the questions at issue could fairly have been considered by a consul, but the vessel continued her voyage and returned to the United States, and no further contract was made. *Held*, that libelants were not entitled to demand the contract at the time they did, and that it was invalid, but that libelants were entitled to pay at the new contract rate from the time the vessel might have reached Gibraltar, when such demand would have been within their rights.

**3. Seamen ⊙⇒25—Release by not conclusive.**

Under Rev. St. § 4552 (Comp. St. § 8341), a release signed on payment at completion of a voyage by seamen who claimed further wages, but whose claim was not considered on its merits by the Commissioner, who told them it could later be determined by a court, cannot be used as a receipt in full.·

In Admiralty. Suit by Joseph S. Shanley and others against the United States. Decree for libelants.

Frederick R. Graves, of New York City (Martin A. Schenck, of New York City, of counsel), for libelants.

Burlingham, Veeder, Masten & Fearey, of New York City (Roscoe H. Hupper and W. J. Dean, both of New York City, of counsel), for respondent.

CHATFIELD, District Judge. The libelants were members of the crew of the Liberty Land (a boat owned by the United States and operated by the United States Emergency Fleet Corporation), who shipped at Philadelphia for a voyage to an African port and return to the United States. The articles were signed at Philadelphia before the Shipping Commissioner, and, although there was some discussion about the necessity of making the contract for a longer period, these particular articles were to expire in six calendar months, as was the custom at the time. When the six months expired, the vessel was in the port of Accra, on the Western coast of Africa. Before reaching the Azores, the vessel was delayed by the breaking down of a turbine. The vessel was further held for six weeks in Lagos, Africa, to repair a windlass and a steam valve chest for which a casting had to be made. The vessel finally left Lagos for a port called Winnebach, but boiler trouble compelled them to again return to Lagos for a period of three weeks. Before the vessel reached a port where there was an American consul who could act as Shipping Commissioner, the six months expired. The vessel was then anchored at Accra in an open roadstead two miles off shore.

The matter of extending the articles was at once taken up for discussion. The captain desired the crew to continue under the old articles. The crew insisted on the making of new articles and de-

manded double pay for the balance of the voyage home. Finally the captain called in a British customs supervisor, in order to have a record made of the matter before some impersonal third party, and the British customs supervisor has certified to the facts.

After negotiations, the captain agreed to pay the rate of wages demanded by the crew, but under a protest or claim of duress and illegal demand, and kept on to some, but not all, of the ports where he had intended to take cargo on his return voyage.

There is almost no dispute as to the facts. The vessel had prior to the time when the six months expired touched at a port where an American consul was available, and the captain had cabled for and received authority to make an extension of the articles. Thereafter the captain had gone on to different ports for which he had cargo, in disregard, as the libelants claim, of the situation which he knew would be later presented.

The libelants contend that on these facts the former contract was terminated and a new agreement entered into, based upon a valid consideration, and free from any duress or breach of the former ship's articles, either in spirit or in letter. The respondent asserts the converse of each of these propositions, claiming as a premise that the members of the crew could not, under the circumstances, terminate or treat as abrogated the obligation which rested upon the crew at the time the paper was signed by the British customs supervisor at Accra.

The captain had obtained authority to extend the ship's articles. Both he, the owners, and the crew evidently considered that the six months' period was an essential element of the contract, subject only to such legal consequences as might follow therefrom. A new contract was therefore legally possible.

[1] In the case of U. S. v. Hamilton et al. (C. C. A.) 268 Fed. 15, the following propositions are laid down, among others:

"(1) The master cannot discharge the crew, and the crew cannot demand wages in full, until the end of the voyage.

"(2) The end of the voyage is not a port of distress, but the port of destination.

"(3) Seamen are bound to serve until the voyage ends in the port of destination, unless there has been a breach of the contract by the master as to the time of the voyage or in some other material particular.

"(4) Extension of the time of the voyage by intention or neglect of the master is such breach of the contract as entitles the seamen to demand their release on that ground in any safe port.

"(5) But extension of the voyage beyond the time mentioned in the contract, due to perils of the sea which the master or owner could not be reasonably expected to guard against, is not a breach of the contract as to time, and does not warrant seamen in leaving the vessel or demanding wages in full before reaching the port of destination."

To these can be added another proposition as follows: If the voyage cannot be completed, or is ended by mutual agreement, the former articles are of no effect upon the future status of the crew, who are free to make a new agreement with the captain, if he has the authority so to do. Rand v. The Hercules, Fed. Cas. No. 11548.

In the case at bar, if the captain voluntarily and with knowledge

of the circumstances terminated the voyage and entered into a new agreement with the same men, as a new crew for a new voyage, this, in the absence of express restriction of his authority, known to those dealing with him, would be sufficient as the basis for a valid agreement. McKenzie v. Oglethorpe, Fed. Cas. No. 8857.

But if the crew either knew that the captain had not the authority to terminate the voyage and to make a new contract, or if they were aware of facts affecting the validity of such new contract, they cannot insist upon the enforcement of the new and invalid agreement.

[2] As was stated in the Hamilton Case, supra, a port of refuge is not a port of destination. Delays occurring during the voyage, from perils of the sea, and circumstances attendant upon the subject-matter of the contract itself, must necessarily be in the minds of the parties to the contract, and the duration of the contract must therefore be prolonged to such an extent as will make it safe and possible, within reasonable limits, for the voyage to be terminated. A crew cannot leave a ship at an unreasonable place, with the voyage unfinished, even if the delay has been caused by such negligence on the part of the captain or the owners that the voyage would, except for such negligence, have been terminated at a port of destination. Nor can the crew leave the vessel while in distress and with the voyage undetermined, solely because of their desire to make a new contract.

The libelants claim that the captain of the Liberty Land, through his desire to extend the voyage beyond its original time limit and to call at ports where he wished to deliver or take on cargo, even though he knew that no American consul was present and no crew could be obtained, ignored the obvious effect of the delays which had occurred through accidents earlier on the voyage. They do not dispute the proposition that a crew could not desert the ship before reaching port if an accident had delayed the vessel in getting to that port, but they contend that if, after the occurrence of accidents, port has been made, where the crew can be discharged and the voyage terminated (if it cannot be completed according to the original articles), then the master has no right to continue upon his original schedule, and, solely to prevent financial loss, insist upon holding the crew beyond the time fixed for the voyage.

The question thus comes down to whether the crew or the owners of the vessel are to stand the consequences of accidental delays in the earlier stages of the voyage.

The court is unwilling to find that seamen may thus arbitrarily compel or coerce the captain of the vessel into yielding to their terms. As was held in the Hamilton Case, supra, such coercion may be under circumstances rendering the seamen liable to a criminal charge of revolt. Such conduct can certainly not be the basis of a valid contract. In the case at bar the captain evidently anticipated delay. He cabled for instructions and authority and received directions to do that which he had the power to do without express direction. If the crew had been willing to sign new articles, extending the period of the voyage on the same terms, no question could have arisen. If they were

not willing to do this and insisted upon a termination of the voyage, they were bound to stand by their vessel until it reached a point where the voyage could properly be considered at an end, and where they could be properly released from their obligations.

The captain of the Liberty Land had done nothing which justified his crew in their insistence that by his own acts and negligence he had prevented them from having the voyage declared terminated, and from insisting upon being sent home or released from their contract. If the vessel had gone to Lagos, or to some other point where an American consul could have been found, the facts show that no other crew could have been obtained within a longer time than was necessary to bring the vessel to Gibraltar, which seems to have been the nearest port where the questions at issue could fairly have been considered by a consul. Until this point was reached, the crew were not in a position to insist that they be sent home, that they be paid off, or that a new arrangement be entered into.

The libelants, therefore, were not in a position to insist upon the making of the contract which the captain entered into under duress and protest. The contract itself is based upon sufficient consideration, provided the making of the contract be valid. But, when duress enters into the exchange of mutual promises, sufficiency of consideration is not the test of legality of the contract. Evidently the captain and the crew entered into an apparent agreement which was rendered invalid by the lack of right on the part of the crew to insist that the agreement be made.

This court has no power to make a new contract if the original contract was invalid. It is impossible to determine what solution the parties would have worked out as a basis of agreement, but, inasmuch as the crew were bound to stick to their contract and to their vessel, at least as far as Gibraltar, and as upon reaching that port, they could have insisted upon making a contract like that forced on the captain at Accra; in other words, inasmuch as the element of duress depends upon the exercise of compulsion prematurely, and inasmuch as the captain of the Liberty Land agreed to pay wages at the rate demanded, rather than to lose his crew, and then proceeded to New York instead of to a port like Gibraltar, where the matter could have been terminated, it would seem that the new contract was invalid only in part or during that period wherein the crew mistakenly assumed that the new contract could be put in force. The captain of the Liberty Land did not have the right to demand that his crew continue to sail with him, according to his wishes and until he should reach the United States, no matter how long the voyage might take.

[3] On this basis the libelants would be entitled to pay at the rate under the new contract (inasmuch as they actually did receive their passage to the United States upon the Liberty Land itself) only for such period as would have been represented by the voyage from Gibraltar to the port of destination. Upon arrival at Philadelphia, the matter of paying off the crew and the dispute as to the rate of wages was

taken before a Shipping Commissioner. The testimony of the Shipping Commissioner is that at the time of the discharge, when a great majority of the crew were present, they were informed by the Shipping Commissioner that "by signing clear, if they could show cause in the future, they could collect their wages if the court rules so," and the understanding was that they were signing under protest. The printed portion of the release was not read to any of the crew by the Commissioner, as he understood that since the Seamen's Act (38 Stat. 1164) the validity of the release was open for construction by a court, and he did not even enter a protest in the paper as signed. The Shipping Commissioner apparently did not go into the merits of the claim by the crew, but denied it as a matter of course and left them to their action. Under these circumstances the release cannot be used as a receipt in full, under section 4552, R. S. (Comp. St. § 8341).

Decree may be entered as above indicated.